## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| MILLICENT R. BARASCH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| -v- | Case No. 1:19-cv-1079-LY |
| GPB CAPITAL HOLDINGS, LLC, et al. | |
| Defendants. | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Millicent R. Barasch through her sons, Jeffrey Barasch and Phillip Barasch in their capacities as powers of attorney and/or trustee of the Millicent Barasch Trust (hereafter, "Barasch") and Loretta DeHay (together with Barasch, "Plaintiffs"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of their counsel, and on information and belief, as follows:

### NATURE OF ACTION

1.      GPB Capital Holdings, LLC (hereafter "GPB Capital") partnered with Austin, Texas-based Ascendant Capital, LLC ("Ascendant Capital") and Ascendant Alternative Strategies, LLC ("Ascendant Strategies") to perpetrate a nearly $2 billion Ponzi scheme (the "GPB/Ascendant Ponzi Scheme").

2.      GPB Capital's website listed Ascendant Strategies as an "affiliate," and GPB Capital and Ascendant Capital shared office space and employees in Austin.    These shared employees would bounce back and forth between GPB and Ascendant Capital's payroll, sometimes receiving commissions from both companies for their work on the same fraudulent sales.  The overlap was not limited to the sales team.  Employees at all rungs of the GPB/Ascendant ladder were readily interchanged.

1

3.     As a state securities regulator recently concluded, the line between GPB Capital and Ascendant is "blurred beyond recognition," with the "only difference between GPB Capital and the Ascendant entities [being] the e-mail addresses used."

4.     The GPB/Ascendant Ponzi scheme was structured as follows.

5.     GPB Capital, led by its CEO David Gentile ("Gentile"), CFO William Jacoby ("Jacoby"), former CFO Minchung Kgil, and its Directors and Partners[1], provided the framework for the Ponzi scheme by creating an elaborate series of individual "Funds," including Defendants GPB Holdings, LP, GPB Holdings Qualified, LP, GPB Holdings II, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC Development, GPB Managed IT Fund (n/k/a "Austin Lake Technologies"), GPB Waste Management, LP, and GPB Holdings III, LP (hereafter, collectively, "the GPB Funds").

6.     Each of the GPB Funds is structured as a limited partnership that acts as a holding company for one or more underlying portfolio companies. GPB Capital serves as the general partner of the Funds and has complete control over their operations and management.  Investors purchase interests in the Funds—not the underlying portfolio companies themselves—as limited partners.

7.     On the surface, the GPB/Ascendant model was a garden variety Ponzi scheme. Investors were promised 8% returns guaranteed, and those purported returns were generated not by actual investment returns, but by tapping the capital investments of the next round of investors (or, in some cases, from the capital accounts of the investor itself, cannibalizing a particular

---

[1] This includes Defendants Manuel Federico Vianna (Managing Partner of GPB Capital), Dotty J. Bollinger (Managing Partner of GPB Capital), Michael Frost (Managing Partner of GPB Capital), Evan Myrianthopoulos (Managing Partner of GPB Capital), Abhaya Shrestha (Managing Partner of GPB Capital), Michael Cohn (Managing Director and Chief Compliance Officer of GPB Capital), Stephen Frangioni (Director of Fund accounting of GPB Capital), and Scott Naugle (Managing Director of Automotive Retail for GPB Capital).  Collectively, these individuals, along with Gentile, Jacoby, and Kgil, are referred to as "the GPB Principals."

investor's own principal).

8.      One or more of the GPB Funds are managed in and operated out of Austin, Texas. Monies realized by these Austin-based Funds, whether in the form of investor capital or from sales of portfolio companies, were distributed to investors across all of the Funds as part of the GPB/Ascendant Ponzi scheme.

9.      GPB Capital and Ascendant were able to keep this enterprise afloat for several years—long enough to generate $1.8 billion in investment capital, a significant percentage of which was siphoned into the pockets of their principals. Plaintiffs were some of the unfortunate individuals who invested in the GPB Capital/Ascendant Ponzi scheme.

10.     Behind the public-facing façade of GPB Capital and the GPB Funds, however, lurked a complex web of entities and individuals who propped up, facilitated, and benefitted financially from the Ponzi scheme. Like an onion, every layer peeled off of the outer surface reveals another layer underneath, each layer ultimately profiting from the investors who put their money into the illegal machine of GPB Capital.

11.     The first layer of the onion includes Austin-based Ascendant Capital and Ascendant Strategies (together, "Ascendant"), and Axiom Capital Management, Inc. ("Axiom").

12.     These entities' principals—Austin resident Jeffry Schneider ("Schneider") for Ascendant, and Mark Martino ("Martino") for Axiom—had been the subject of state and NASD (FINRA) disciplinary sanctions and suspensions.   Instead of disclosing this information to investors, GPB hid their role in the scheme through the involvement of purported "affiliates" Ascendant and Axiom.

13.     These affiliate entities served as the underwriters for the GPB Funds, and were thus responsible for setting up and distributing the GPB Funds shares to investors.

14.     Ascendant Capital was responsible for marketing and selling the limited partnership

interests necessary to keep the GPB fraud afloat. **In fact, most, if not all, of the sales and marketing efforts used to promote interests in the GPB Funds emanated from Ascendant Capital's office in Austin, Texas.** Its sales team (referred to by insiders as "sales warriors") placed thousands of phone calls a month (and sent thousands of emails) as they scrambled to maintain the constant influx of fresh cash necessary to maintain the GPB/Ascendant Ponzi Scheme.

15.     Ascendant Capital's sales warriors were rewarded handsomely for their hustle; they earned more than $800,000 in commissions in a single month at the height of the fraud.

16.     Because of Ascendant Capital's Austin-based solicitation efforts, thousands of investors—including Texas residents—were duped into investing in the GPB/Ascendant Ponzi Scheme.

17.     Undisclosed to potential investors was the fact that Ascendant, Axiom, and GPB Capital were functionally the same entity, as they were collectively owned by Gentile, Schneider, and Martino.[2]

18.     This is a flagrant and outrageous conflict of interest—the GPB Owners used these conflicted entities to distribute the GPB Funds, thus creating an additional revenue stream through which they siphoned off millions of dollars' worth of investor money in the form of fees. Investors were never informed that the fees they were paying to a supposed third party for underwriting services were funneled through to the GPB Owners and/or GPB Capital itself. This conflict was made worse by the fact that both Schneider and Martino have been subject to multiple disciplinary and legal proceedings related to their conduct in the securities space, proceedings that should have

---

[2] Schneider, Martino, Gentile, as well as their affiliate entities "DJ Partners LLC," and "MR Ranger LLC," (both described in more detail *infra*) are hereafter collectively "the GPB Owners."

disqualified them from serving as the underwriters for the GPB Funds at all.

19.     Money flowed freely between the GPB entities in other ways, too. Investor capital from one Fund was used to pay distributions made in another Funds, sometimes characterized as loans.  On numerous occasions, Funds would use investor money to purchase assets in which Gentile, Schneider, or other GPB insiders had an interest—often at inflated rates.  None of the foregoing was disclosed to GPB's investors.

20.     The second layer of the onion includes the entities that facilitated the Ponzi scheme, namely, auditors RSM US LLP ("RSM"), Gentile Pismeny & Brengel LLP, Crowe, LLP, Crowe Global and the Doe Auditors 1 through 10 (hereafter, "the Auditors"), as well as Phoenix American Financial Services, Inc., which served as the fund administrator ("the Fund Administrator").

21.     The Auditors' work in connection with the GPB Funds' financials for the time period 2013 to 2019 revealed that the Funds consistently made purported annual "distributions" to investors that were far in excess of the Funds' annual net incomes.  Indeed, the promised 8% distribution figure was not possible in light of the excessive fees that GPB/Ascendant siphoned off the top of each investment.  This same information was made available to the Fund Administrator.

22.     Nonetheless, the Auditors and the Fund Administrator "papered over" GPB Capital's malfeasance, issuing documents and audits that were at times blatantly false, and consistently misleading—all while receiving handsome fees for their efforts.

23.     Later, EisnerAmper LLP, ("EisnerAmper"), was brought in as "cover" for GPB's ongoing activities when the cracks began to appear, reassuring investors such as Plaintiffs and class members that GPB was a viable, going concern.  Upon information and belief, EisnerAmper was made aware of the foregoing issues prior to its engagement as GPB's replacement auditor, and in any event was made aware of them no later than May 2019.

24.     Without the Auditors, the Fund Administrator, and EisnerAmper, GPB Capital and its principals would not have been able to keep the scheme afloat, and thus not able to extract proceeds from Plaintiff and other investors.

25.     The third layer of the onion involves a series of self-dealing transactions by the GPB Funds providing yet another (illegal) revenue stream for GPB principals and their associates. To that end, a recent state regulatory investigation determined that GPB Capital's control persons have various ownership interests in entities that the GPB Funds transacted business with.

26.     Plaintiff expects that, when the entirety of the GPB/Ascendant malfeasance comes to light, there will be many of these inside deals. But, for the present, Plaintiff is aware of one of one such deal in detail. GPB Capital, through GPB Automotive Portfolio, over a period of about nine months purchased DJD Holdings, LLC, which owned a series of car dealerships under the umbrella of the Lash Auto Group. DJD Holdings, LLC, in turn, was 85% owned by CKGF Holding, LLC, and CKGF was in turn owned by Gentile, McAnna, Ltd., Rina Chernaya, Diana Chernaya, Robert Kessler, and Gerald Francese (collectively, with CKGF Holding, LLC, "CKGF"). Thus, GPB Capital (controlled by Gentile) bought the assets of the conglomerate controlled by Gentile and his associates, funneling money from Plaintiffs and investors into the pockets of Gentile and his associates.

27.     None of these improper and self-dealing transactions were disclosed.

28.     Through this action, Plaintiffs and other similarly-situated investors seek to encompass the entirety of the onion that is GPB. In doing so, Plaintiffs and the class seek to hold all responsible parties accountable for what at the end of the day is a $1.8 billion fraud on investors.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act

of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

30.    This Court has personal jurisdiction over each Defendant based upon the facts alleged herein.

31.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Ascendant, one of the key Defendants, maintains its principal place of business in this district, Defendant Schneider resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **PARTIES**

32.    Plaintiff Millicent Barasch is, and was at all times mentioned herein, an individual citizen of the State of Florida, and currently resides in that state.

33.    Plaintiff Loretta DeHay is, and was at all times mentioned herein, an individual citizen of the State of Texas, and currently resides in this state.

34.    Defendant GPB Capital Holdings, LLC is a Delaware limited liability company with a principal place of business in New York City. GPB is the general partner of the GPB Funds and was at all relevant times a control person, manager, and majority owner of the GPB Funds. GPB, therefore, effected the GPB Funds' securities offerings. GPB is an investment advisor registered under the Investment Advisers Act of 1940 ("IAA").

35.    Defendant David Gentile is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Gentile is, among other relevant roles, the Chief Executive Officer of GPB Capital Holdings, LLC.

36.    Defendants GPB Holdings, LP, GPB Holdings II, LP, GPB Holdings III, LP, GPB Holdings Qualified, LP, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB NYC

Development, LP, GPB Managed IT Fund (n/k/a "Austin Lake Technologies"), and GPB Waste Management Fund, LP are limited partnerships that were organized under the laws of Delaware for the purpose of investing each of the Funds' cash assets into operating businesses in various industries. GPB was the general partner for each of the Funds.

37.     Defendant GPB Managed IT Fund was headquartered in and conducted all operations from Austin, Texas.  Funds realized by GPB Managed IT Fund flowed through and between each of the other GPB Funds in furtherance of the GPB/Ascendant Ponzi Scheme.

38.     Defendant Ascendant Capital, LLC is a Texas corporation and has a principal place of business in this district in Austin, Texas.

39.     Defendant Ascendant Alternative Strategies, LLC is a Delaware corporation and has a principal place of business in this district in Austin, Texas.

40.     Defendant Axiom Capital Management, Inc. is a Delaware corporation and has a principal place of business in New York, New York.

41.     Defendant Jeffry Schneider is, and was at all times mentioned therein, an individual citizen of the State of Texas, and currently resides in this state. Defendant Schneider is, among other relevant roles, a former employee of Axiom Capital Management and the CEO of Ascendant Capital, LLC.

42.     Defendant Mark Martino is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Martino is, among other relevant roles, the former CEO of Axiom Capital Management and the current CEO of Ascendant Alternative Strategies, LLC.  Upon information and belief, Martino, either personally or by directing his employees or other agents, marketed the sale of GPB Funds from GPB/Ascendant's office in Austin, Texas.

43.     Defendant William Jacoby is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Jacoby is the Chief Financial Officer of GPB Capital Holdings, LLC. Upon information and belief, Jacoby, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

44.     Defendant Minchung Kgil is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Kgil was the Chief Financial Officer of GPB Capital Holdings, LLC. Upon information and belief, Kgil, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

45.     Defendant Manuel Frederico Vianna is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state.  Defendant Vianna was a Managing Partner of GPB Capital Holdings, LLC. Upon information and belief, Vianna, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

46.     Defendant Dotty Bollinger is, and was at all times mentioned therein, an individual citizen of the State of Tennessee, and currently resides in that state. Defendant Bollinger was a Managing Partner of GPB Capital Holdings, LLC.   In this capacity Ms. Bollinger sourced, structured, and monitored the GPB Funds' acquisition of healthcare companies. Upon information and belief, Bollinger, either personally or by directing her employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

47.     Defendant Michael Frost is, and was at all times mentioned therein, an individual citizen of the State of Texas, and currently resides in this state. Defendant Frost was a Managing

Partner of GPB Capital Holdings, LLC responsible for the firm's Technology Enabled Services Investments. Upon information and belief, Frost, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

48.     Defendant Evan Myrianthopoulos is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Myrianthopoulos is a Managing Partner of GPB Capital Holdings, LLC. In this capacity he is responsible for sourcing, structuring and closing loans for GPB Capital's Debt Strategies. Upon information and belief, Myrianthopoulos, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

49.     Defendant Abhaya Shrestha is an individual citizen of the State of New York and currently resides in that state. Prior to 2018, Defendant Shrestha was an individual citizen of the State of New Jersey. Defendant Shrestha was a Managing Partner of GPB Capital Holdings, LLC. He also sat on the Acquisition Committee for GPB Holdings II, and in this capacity was responsible for approving the Fund's acquisitions of portfolio companies and other assets. Upon information and belief, Shrestha, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

50.     Defendant Michael Cohn is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Cohn was a Managing Director and the Chief Compliance Officer of GPB Capital Holdings, LLC. In that capacity Cohn oversaw GPB Capital's compliance, risk management, and management processes

and procedures, and was specifically tasked with helping GPB Capital and its Funds stay in compliance with new and existing rules and regulations. Upon information and belief, Cohn, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

51.     Defendant Steven Frangioni is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Frangioni was the Director of Fund Accounting of GPB Capital Holdings, LLC. In this capacity he is responsible for overseeing all accounting, finance, and fundraising at GPB Capital. Upon information and belief, Frangioni, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

52.     Defendant Scott Naugle is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. Defendant Naugle is the Managing Director of Automotive Retail of GPB Capital Holdings, LLC.  Naugle is responsible for the financial oversight of the GPB Automotive Fund's dealership investments, including financial reporting, acquisition, due diligence, treasury, risk management, procurement, internal audit and profit optimization. Upon information and belief, Naugle, either personally or by directing his employees or other agents, transacted business for or on behalf of the GPB Funds from GPB/Ascendant's office in Austin, Texas.

53.     Defendant DJ Partners, LLC is a Delaware corporation and has a principal place of business in this district in Austin, Texas. On information and belief, DJ Partners owns a substantial interest in Ascendant Alternative Strategies, LLC, and in turn is owned and controlled by Defendants Gentile and Schneider.

54.     Defendant MR Ranger, LLC is a Delaware corporation and has a principal place of business in this district in White Plains, New York. On information and belief, MR Ranger owns a substantial interest in Ascendant Alternative Strategies, LLC, and in turn is owned and controlled by Defendant Martino.

55.     Defendant RSM US LLP, formerly known as McGladrey LLP, is a limited liability partnership with its principal place of business in Chicago, Illinois. On information and belief, Defendant RSM US LLP was the auditor of GPB Capital Holdings and at least the GPB Holdings II Fund. In this capacity RSM had a local Austin, Texas-based team that audited holdings belonging to one or more of the Funds at the heart of the GPB/Ascendant Ponzi Scheme.  RSM also transacted business with entities and individuals located in Austin, Texas, and further knew that its work product would be used by Austin-based individuals in furtherance of the GPB/Ascendant Ponzi Scheme. RSM is the fifth-largest accounting firm in the State of Texas, with over 700 employees between offices in Dallas, Houston, San Antonio, and Austin.  RSM's website claims to service 16,000 clients throughout the State of Texas. RSM has been assigned a Texas taxpayer number and is authorized to transact business in the State of Texas.

56.     Defendant EisnerAmper LLP is a limited liability partnership with its principal place of business in New York, New York. On information and belief, Defendant EisnerAmper LLP was the auditor of GPB Capital Holdings and at least some of the GPB Funds, including GPB Automotive.  In this capacity EisnerAmper transacted business with entities and individuals located in Austin, Texas, and further knew that its work product would be used by Austin-based individuals in furtherance of the GPB/Ascendant Ponzi scheme.  EisnerAmper has a significant client base in Texas, and maintains an office in Dallas, Texas. Its website makes extensive references to its work as a "trusted business advisor to middle-market companies in Texas" with

its "boots firmly planted in Texas."  EisnerAmper's website further notes its "expertise serving clients in private equity, including fund sponsors and their portfolio companies."  EisnerAmper has been assigned a Texas taxpayer number and, upon information and belief, was authorized to transact business in the State of Texas as of the date of this suit was filed.

57.     Defendant Gentile Pismeny & Brengel LLP is a limited liability partnership with its principal place of business in Garden City, New York. Upon information and belief, Defendant Gentile Pismeny & Brengel LLP was the accounting firm for GPB Capital Holdings and at least some of the GPB Funds.  In this capacity Gentile Pismeny & Brengel transacted business with entities and individuals located in Austin, Texas, and further knew that its work product would be used by Austin-based individuals in furtherance of the GPB/Ascendant Ponzi Scheme.

58.     Defendant Crowe, LLP is a limited liability partnership with its principal place of business in Chicago, Illinois. Upon information and belief, Defendant Crowe LLP was the auditor of GPB Capital Holdings and at least some of the GPB Funds. In this capacity Crowe transacted business with entities and individuals located in Austin, Texas, and further knew that its work product would be used by Austin-based individuals in furtherance of the GPB/Ascendant Ponzi Scheme. Crowe is a large accounting, consulting and technology firm that maintains offices in both Dallas and Houston, Texas.  Its offices in the Dallas area have been open since at least 2008 and employ approximately 65 individuals. Crowe has been assigned a Texas taxpayer number and is authorized to transact business in the State of Texas.  Crowe's website touts that it serves nearly 100 Texas-based clients, and has been named "One of the Best Companies to Work for in Texas."

59.     Defendant Crowe Global is an Association organized according to the laws of the nation of Switzerland, and has a principal place of business in New York, New York. On information and belief, Crowe LLP is a wholly-owned subsidiary of Crowe Global.

60.     Defendant Doe Auditors 1 through 10 are the currently unknown additional auditors retained by Defendant GPB Capital to perform audits on the GPB Funds.

61.     Defendant Phoenix American Financial Services, Inc. is a California corporation with its principal place of business in San Rafael, California.   Phoenix served as the Fund Administrator.   In this capacity Phoenix transacted business with entities and individuals located in Austin, Texas, and further knew that its work product would be used by Austin-based individuals in furtherance of the GPB/Ascendant Ponzi Scheme.   Phoenix also sent statements to Texas investors reflecting fictitious "distributions" purportedly realized from operations of the portfolio companies and otherwise concealing the fees deducted from the Texas investors' accounts.

62.     Defendant CKGF Holding, LLC is a New York corporation and has a principal place of business in this district in New York, New York.   CKGF was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

63.     Defendant McAnna, LP is a limited partnership with its principal place of business in Boca Raton, Florida. On information and belief, Defendant McAnna, LP, owns or controls a substantial interest in CKGF Holding, LLC and was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

64.     Defendant Robert Kessler is, and was at all times mentioned therein, an individual citizen of the State of New York, and currently resides in that state. On information and belief, Defendant Robert Kessler owns or controls a substantial interest in CKGF Holding LLC and was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

65.     Defendant Gerald Francese is, and was at all times mentioned therein, an individual citizen of the State of Rhode Island, and currently resides in that state. On information and belief, Defendant Gerald Francese is the registered agent for CKGF Holding LLC and was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

66.     Defendant Rina Chernaya is, and was at all times mentioned therein, an individual citizen of the State of Florida, and currently resides in that state. On information and belief, Defendant Rina Chernaya owns or controls a substantial interest in CKGF Holding LLC and was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

67.     Defendant Diana Chernaya is, and was at all times mentioned therein, an individual citizen of the State of Florida, and currently resides in that state. On information and belief, Defendant Diana Chernaya owns or controls a substantial interest in CKGF Holding LLC and was involved in one or more self-dealing transactions with the GPB Funds that emanated from GPB/Ascendant's office in Austin, Texas.

## FACTUAL ALLEGATIONS

### The Formation of the GPB Funds, the Role of Ascendant, and the GPB Owners

68.     In or about 2012, Defendant Jeffry Schneider formed Ascendant Capital, LLC, as an Austin-based branch of Defendant Axiom Capital Management, LLC. Schneider personally funds Ascendant Capital and maintains full control of its business.

69.     The CEO of Axiom at the time of the formation of Ascendant was Defendant Mark Martino.

70.     In or about 2013, Schneider and Ascendant partnered with Defendant David Gentile

15

to form GPB Capital.  Schneider eventually received the title of "Strategic Advisor" to GPB Capital. Defendant William Jacoby served as CFO of GPB Capital.

71.      While GPB Capital was nominally formed to create "an income-producing private equity fund,"[3] as set forth below GPB Capital's true purpose was to solicit investor funds to purchase—after deducting hefty, and undisclosed, brokerage fees for Ascendant—assets that would enrich Gentile, Schneider, and the other GPB Owners.

72.      Under this model, GPB Capital would act as the general partner of a series of Funds that each had specific investment strategies (or, more accurately, purported investment strategies). Investments in the funds would be made at the direction of the general partner, GPB Capital; however, Schneider and Ascendant were heavily involved in GPB Capital's operations and received undisclosed fees for consulting on GPB Capital's acquisitions to the tune of over $9 million in 2017 alone.

73.      Investors would buy limited partnerships in one or more of the funds, and would thus be entitled to receive investment proceeds from the funds.  The hallmark of the GPB Funds was their supposed 8% monthly distributions, to be paid out of the operations of the Funds' portfolio companies.

74.      Schneider and Ascendant Capital were given what was essentially the exclusive right to sell limited partnerships investments in the GPB Funds. In this regard Ascendant Capital's role included seeking out agents of broker-dealer and investment advisor firms and convincing them to sell GPB Funds to their customers.

75.      By 2015, in Schneider's own words, Ascendant Capital was "dedicated. . . to structuring funds and raising capital exclusively for GPB."

---

[3] See http://www.foundingaustin.com/home/ascendantcap (last visited June 16, 2020).

76.     GPB Capital likewise described Ascendant Capital as the exclusive managing entity for GPB Fund offerings.

77.     As the self-described "co-founder" of GPB Capital, Ascendant and Schneider have a clear conflict of interest.  Outwardly they presented themselves as the purportedly neutral broker for the GPB Funds' limited partnerships, when in reality they functioned as an in-house marketing arm and advisor to GPB Capital.  This created an extra layer of additional undisclosed fees for "co-founder(s)" Ascendant and Schneider.

78.     This conflict of interest became more acute in 2017. At that time, Ascendant Capital became fully independent of Axiom Capital Management, and conducted its distribution and underwriting services by and through Ascendant Alternative Strategies, LLC (previously defined as "Ascendant Strategies"), as a broker- dealer.  Ascendant Capital has since conducted all of its broker-dealer activities through Ascendant Strategies.

79.     Ascendant Alternative Strategies is owned by Defendant DJ Partners, LLC and MR Ranger, LLC. DJ Partners was in turn owned by Gentile and Schneider, while MR Ranger was owned by former Axiom CEO Martino.

80.     **In other words, the entity that was creating the limited partnerships, the broker- dealer that was distributing those partnerships, and the entity that was managing the money coming in from those limited partnerships were all controlled by the same common group of people, sharing the proceeds of all three phases of the process in common—without disclosing any of this to investors or potential investors in prospectuses or other documents.**

81.     Together, Gentile, Schneider (both as a GPB Capital control person and also in his capacity as Ascendant's CEO), and Martino served not only as the "GPB Owners," but also as the

motive force that made the operation of the GPB/Ascendant Ponzi Scheme possible.

## Austin, Texas was the Hub of the GPB Marketing Machine

82.     The line between GPB Capital, Gentile, Schneider, and Ascendant is "blurred beyond recognition."  Consistent therewith, all sales and marketing efforts used to solicit investors to purchase GPB Funds originated in and emanated from Ascendant's office in Austin, Texas.

83.     For example, during the period 2015-2019, Ascendant Capital's sales team, based in Austin, made tens of thousands of phone calls trumpeting the GPB Funds' 8% distributions for investors—which were supposedly paid out of funds realized through the operations of the Funds' portfolio companies.

84.     The broker/dealers that Ascendant Capital's sales team targeted were often flown to Austin for purported "diligence" meetings that in reality were little more than a series of parties centered around a token GPB pep rally touting the excessive commissions that brokers would be able to extract from investors (7-11% or higher).  These meetings occurred monthly on average, if not more frequently.

85.     GPB Capital, Ascendant and/or Axiom would often pay for a broker's attendance at these meetings.  To top it all off, GPB Capital, Ascendant, and/or Axiom also paid third parties to prepare due diligence reports on the attending brokers' behalf.

86.     Additionally, Ascendant Capital drafted key marketing and promotional documents, as well as private placement memoranda, fund prospectuses, investment summaries, and other documents that were used to promote the GPB Funds to potential investors.

87.     These materials were widely available to and relied upon by individual investors considering investing in a GPB Fund.  Most, if not all, of these misleading communications were sent to broker-dealer agents and investment adviser representatives from Ascendant Capital's

office in Austin, Texas.

88.     These documents contained misrepresentations about the GPB Funds'
distributions—specifically, the notion that the Funds paid 8% distributions out of the operations
of their portfolio companies.  *See infra*.    These documents also failed to disclose the conflict of
interest in the GPB Distribution model, as well as the GPB Funds' propensity for self-dealing
transactions.  *See infra.*

### The GPB Funds Were, and Are, a Ponzi Scheme

89.     From day one, the GPB Funds were a scam. The business model of the Funds was
nonsensical.

90.     The nonsensical nature of GPB Capital's strategy was covered up by blatant and
overtly false statements made, transmitted, and amplified by GPB Capital, Ascendant, and Axiom.

91.     At the heart of GPB Capital's deception was a simple claim—the GPB Funds return
8% annually to investors in the limited partnerships, kicking in only three months after an investor
buys into the Funds.

92.     Indeed, the GPB Funds did pay 8% consistent annual returns—on paper. Each
investor in the GPB Funds received an annual statement showing an 8% return, on top of their
principal investment.

93.     These annual statements were wholly fraudulent.  Eventually it would come to light
that the GPB Funds were paying these "returns" out of the investment capital of *other investors*,
or even out of the investment capital of the *investor himself or herself*. There were no investment
proceeds, and no actual returns, only a set of fake numbers on a piece of paper.

94.     Not surprisingly, the true nature of these "returns" was not disclosed to investors;
in fact, during the time period 2014 – 2018, GPB Capital, Ascendant, and Axiom were saying

precisely the opposite in the private placement memoranda, slideshows, presentations, and other communications they were blasting out to potential investors at a feverish pace

95.     From 2014-2018, numerous materials disseminated by Ascendant for each of the GPB Funds consistently recited that these 8% distributions were "fully covered" by, paid "only from," or were derived "100% funds from," operations.

96.     As an example, at the end of 2015, GPB Capital sent a letter to investors in GPB Holdings II LP stating "[w]ith 9 assets generating healthy cash flow to the Fund, GPB continues to pay all distributions at the stated rate of 8% fully covered from funds from operations." This, once again, was completely untrue, as "distributions" were being made from investor capital.

97.     Similarly, the GPB Automotive Portfolio LP's private placement memorandum (the equivalent of a prospectus), stated unambiguously that "we will make distributions based on cash flow we have received from Dealerships."   This was completely false, yet this falsehood carried all the way through the final private placement memorandum issued for GPB Automotive in April 2018.

98.     Investors relied upon these (mis)statements in considering whether to purchase a limited partnership interest in a GPB Fund.  No one would willingly invest in a model that used others' investment dollars (let alone the investor's own principal, as was the case here) to pay promised distributions..  No one would willingly invest money in a Fund where investment decisions were not focused on the best interests of investors, but instead based on what would enrich the personal interests of the GPB Owners.  And the hidden fees flowing to those Owners through related entities disguised as "underwriters" were a glaring red flag that investors had a right to consider prior to investing their savings with GPB and its cohorts.

99.     GPB Capital, the GPB Funds, Ascendant, and their various Officers, Directors, and

Partners knew that these statements were being provided to investors and potential investors, and further, knew that these statements were false. GPB Capital and/or the GPB Funds' undisclosed financials confirmed that most, if not all, of the GPB Funds had incurred net losses during this period while still paying out distributions to limited partners as promised. At times, more than half of the distributions paid to limited partners were paid out of investor funds.

100.    Indeed, GPB Capital filed documents with the SEC that, in essence, admitted that they were running a Ponzi scheme:

> **No Assurance of Distributions**. Any distributions can be paid out of any available working capital, which includes Investor's invested capital in the Company. Amounts that the Companies distribute to Investors have in the past accordingly included, and may in the future accordingly include, invested capital and have not been, and may not in the future be, entirely comprised of income generated by the Portfolio Companies.

May 1, 2019 Form ADV. This information was not disclosed or communicated to investors prior thereto.

101.    **One or more of the Funds included in the GPB/Ascendant Ponzi Scheme were managed in and operated out of Austin, Texas. Critically, monies realized by these Austin-based Funds, whether in the form of investor capital or from sales of portfolio companies, were distributed to investors across all of the Funds as part of the GPB/Ascendant Ponzi scheme.**

102.    Ascendant's CEO (and Texas resident) Schneider was intimately involved in GPB Capital's strategy and direction. As a "strategic advisor" to GPB Capital, he knew that GPB Capital's promises of 8% annual distributions were false, and that GPB Capital was paying distributions using investor capital.

**All Parties to the GPB Funds—Except the Investors—Handsomely Profited from the GPB/Ascendant Ponzi Scheme**

103.     While investors were receiving fake "distributions" that cannibalized their own investments, everyone else involved with the GPB Funds were receiving very real, and very substantial, proceeds from the fraudulent operations of the Funds.

104.     GPB Capital, Ascendant Capital, Ascendant Strategies, and Axiom (and, by extension, the GPB Owners) realized handsome profits from the exorbitant fee structure of the GPB Funds. For example, the Automotive Portfolio LP's PPM discloses that an investor will be charged due diligence fees (1% of invested capital), placement and marketing support fees (1.75%), wholesaling fees (up to 1.25%), organizational expenses (up to 1.25%), managerial assistance fees (2.0% of capital contributions), acquisition fees (between 1.75% and 2.75% of the price of assets acquired), and partnership expenses.

105.     On top of that, GPB Funds offered extraordinary sales commissions to broker-dealers who marketed the limited partnerships to investors, including Ascendant when it sold the partnerships directly to investors. Contrary to the standard practice in the industry, these commissions were paid by the investor, not by the issuer of the limited partnerships. More to the point, they ranged from 7% to as high as 11% of the capital invested—far beyond any similar offering.

106.     The Fund Administrator, *i.e.*, Phoenix American Financial Services, likewise profited handsomely, receiving a 7% commission on all investment monies received from the Funds' limited partners.

107.     Taken together, when an investor signed on the dotted line and put money into the GPB Funds, 20% or more of that money was immediately extracted to pay GPB, the underwriters Ascendant and/or Axiom, and brokers. With a book value of over $1.8 billion for the GPB Funds,

this represents many hundreds of millions of dollars in fees paid to these parties by investors in the GPB Funds.

108.     On top of all of that, GPB Capital paid itself a 20% commission on any returns the Funds actually realized, in the form of "management and performance fees."

109.     Given this fee structure, it was essentially economically and logically impossible for the GPB Funds to return a real profit to investors. An investor was, in essence, down 20% or more from day one of the investment in the form of the fees taken out by GPB Capital, the purported underwriters Ascendant and Axiom,  brokers, and finally, the Fund Administrator. And, if the Fund actually made some returns on its investments, a significant portion was siphoned off to the GPB Principals.

**The GPB Funds Were Unregistered Securities**

110.     While all of this was occurring, the GPB Funds were operating, and being sold as, improper unregistered securities.

111.     The limited partnership interests in the GPB Funds are "securities" within the meaning of the Texas Securities Act.  *See* Texas Revised Civil Statutes art. 581-4(A).

112.     Under Texas law, securities that are, *inter alia*, not registered on an approved stock exchange are subject to registration requirements, either directly with the Texas Securities Commissioner or via "coordination" with the SEC. *See* Texas Revised Civil Statutes, art. 581-7(B) (registration by notification) and (C) (registration by coordination).

113.     The GPB Funds were not properly registered with either the Texas Securities Commissioner or with the SEC.

114.     Moreover, the limited partnerships in the GPB Funds were clearly subject to registration. Under Section 12(g) of the Exchange Act, a class of securities with more than

$10,000,000 in assets and 2,000 or more equity holders are subject to registration. *See* 15 U.S.C. § 78l(g).

115.     Many, if not all, of the Funds met the requirement for registration under the Section 12(g) on this basis, and yet failed to register.  For example, GPB Holdings II sold at least $645 million worth of interests to well in excess of 2,000 investors, while GPB Automotive sold at least $622 million worth of interests to well in excess of 2,000 investors.

116.     This data was available to anyone involved in the GPB/Ascendant machine.  The third party-due diligence reports that GPB/Ascendant paid for and furnished to brokers attending the sales meetings in Austin also contained this information.  Some of these due diligence reports even underscored this for emphasis, and further noted GPB's pledge to comply with Rule 12(g) after it crossed these thresholds, stating for example:

> As of the date of this opinion, the Fund has raised $414.8 million from 4,306 investors. As mentioned in the 2016 Update, GPB indicated to our firm at the time that the Fund intends to accept over 2,000 Limited Partners and begin public reporting, starting with the 2016 Annual Report (which would have been released in March 2017). We note that the number of Class A Limited Partners exceeded the 2,000 investor limit during January 2017, and was at 3,872 as of June 30, 2017. However, the Fund has not registered or reported under the 1934 Act as of the date of this 2017 Update. GPB has indicated that the Fund will begin public filings, as required, with the 2017 10-K in April 2018.

117.     GPB's failure to disclose that Schneider and Martino, the control persons for Ascendant and Axiom (*i.e.*, the affiliate "sales warriors" keeping the scheme afloat), respectively, had been the subject of state and NASD (FINRA) disciplinary sanctions and suspensions further foreclosed GPB from relying on its purported Rule 506 Reg. D registration exemption.

118.     Notwithstanding, none of the GPB Funds were ever registered with the SEC, or with the State of Texas, and GPB Capital and Ascendant continued selling interests at all relevant

times hereto.

### **The GPB Funds and Owners Engaged In Extensive Self-Dealing, In Breach of their Fiduciary Duties**

119.     Gentile concealed his indirect ownership interest in the Funds' lead underwriter, Ascendant.  Accordingly, investors were not made aware that one of GPB's Owners was receiving undisclosed commissions, disguised as "fees," from the sale of GBP Funds.

120.     The outrageous fee structure was not the only manner in which Gentile enriched himself in operating GPB Capital and the GPB Funds.  He also engaged in self-dealing, having the GPB Funds engage in transactions with companies that were owned by Gentile and his undisclosed affiliates—often at inflated market values.  Simply put, Gentile used investors' money to overpay himself for assets he sold to the GPB Funds.  These self-dealing transactions were concealed from investors.

121.     Plaintiff anticipates that discovery in this matter will reveal many connections and insider transaction associated with the GPB Funds. Plaintiffs' prior investigation has revealed, however, one such relationship which, Plaintiff suggests, is representative of the inside transactions and relationships connected with the GPB Funds

122.     Defendant CKGF Holding LLC is an investment vehicle for the Chernaya family. According to Court records, 46.47% of CKGF Holding LLC was owned by Defendant McAnna, Ltd., 23.4% was owned by Defendant Rina Chernaya, 23.4% was owned by Defendant Diana Chernaya, 2.94% was owned by Defendant David Gentile, 2.94% was owned by Defendant Robert Kessler, and 1.18% was owned by Defendant Gerald Francese.

123.     As such, Defendant Gentile was an insider of CKGF Holding LLC, and would personally benefit from any transactions in which CKGF was a party.

124.     In 2012, CFKG Holding LLC was the majority owner of DJD Holdings, LLC and

DJD Holdings2, LLC (collectively, "DJD").  DJD in turn was the owner of two car dealerships in New York state, Lash Auto Group ("LAG") d/b/a Volkswagen of White Plains and Lash Auto Group 2 ("LAG2") d/b/a Volkswagen of Oneonta.

125.    On May 13, 2013, GPB Automotive purchased 51% of both DJD entities, at a cost of $3,000,000. As a part owner of the DJD entities, by and through his ownership stake in CKGF Holding, Gentile was personally enriched by this transaction, along with his business associates.

126.    On February 13, 2014, GPB Automotive purchased the remaining 49% of DJD Holdings, LLC and 44.1% of DJD Holdings2, LLC, for a total price of $2,178,250. Thus, once again, Gentile and his business associates were personally enriched from the receipt of investor income from the GPB Funds.

127.    A recent regulatory investigation has revealed other instances of Gentile's self-dealing.  For example, at all relevant times hereto Gentile had an interest in an LLC named "LSG Auto" ("LSG").  A Nissan dealership paid approximately $350,000 to LSG during the time period July 2014—September 2014.  Soon thereafter, GPB Automotive purchased the Nissan dealership, yet never disclosed the payments that had been made to Gentile's company prior to the purchase.

128.    In yet another example, in 2013 GPB Automotive acquired a 50% ownership in a Buick/GMC dealership.  During the time period 2014-2017, that dealership—which was a GPB Automotive asset, funded at least in part with GPB investor money—paid over $330,000 to LSG. These payments were likewise never disclosed to investors.  Indeed, LSG was never identified as a related third-party in any GPB Fund disclosure document or other marketing materials. Nonetheless, hundreds of thousands of dollars or more changed hands between LSG and GPB Funds.

129.    Gentile also had an interest in an entity named "GPB Lender."  Gentile used GPB

Lender to make interest-bearing loans to various Funds when they needed additional capital to fund acquisitions. Investors were not informed that Gentile would use an entity he owned to make loans to the Funds.

130. On at least one occasion, Gentile used GPB Lender to issue a loan to an entity owned by LSG. That entity, and the obligation to repay the money to Gentile's company GPB Lender, was later acquired by GPB Automotive. The foregoing was not disclosed to GPB's investors.

131. GPB Capital, Gentile, and Schneider have run GPB Automotive into the ground. Its prized asset, Prime Automotive, was once the crown jewel of its portfolio; one of the largest networks of auto retailers in the entire country. David Rosenberg, Prime's longtime owner (later transitioned to CEO after GPB's acquisition), discovered the self-dealing described above, as well as the fact that GPB Automotive was inflating its revenues. He shared this information with GPB's auditors in an attempt to get the truth out, and eventually, after that was unsuccessful, shared the information with the SEC. Rosenberg was fired for his efforts, and now, manufacturers like Toyota and Volkswagen are exercising their contractual rights to strip Prime (and by extension, GPB Automotive) of its interest the dealerships.

132. GPB Automotive was not the only GPB entity engaged in self-dealing. GPB Capital paid nearly $150,000 to a New York law firm owned by Gentile's wife during the period 2016-2017. GPB Capital also Gentile's wife on the payroll as an employee, paying her over $90,000. Again, investors were not made aware of these insider arrangements.

133. Schneider, as a "strategic advisor" to and control person of GPB Capital, was aware of Gentile's self-dealing, and his mismanagement of GPB Automotive.

134. So were the GPB Principals (defined at n. 1, *supra*). Each of these individuals had

access to and were integrally involved in providing data used in the preparation of the financial and other records that disclosed Gentile's self-dealing.  Indeed, David Rosenberg was employed by one of GPB Automotive's portfolio companies and was able to detect the fraud perpetrated by GPB, Ascendant, and their Owners.

135.    Finally, not to be outdone, Schneider made sure to partake in the self-dealing in his own right as well.   He and/or Ascendant Capital (which he wholly-owned) received more than $16 million in acquisition fees from GPB Capital, including more than $8.5 million when GPB acquired the Prime Automotive Group in October 2017.

136.    The more money that Ascendant and Axiom were able to funnel into the GPB/Ascendant Ponzi Scheme, the more the GPB Owners—including Gentile, Schneider, and Martino—stood to make in undisclosed fees.  Investors were never made aware that those underwriting the GPB Funds would also receive substantial commissions derived from the assets eventually purchased by the GPB Funds.

### The GPB/Ascendant Ponzi Scheme Was Made Possible By The Fund Administrator, the Auditors, EisnerAmper, and Last but not Least, the GPB Principals

137.    None of the activities of GPB Capital and the GPB Funds would have been possible without the assistance of some key additional parties—the Fund Administrator, the Auditors, and later, EisnerAmper.

138.    Operations between GPB Capital and Ascendant were so intermingled—sharing employees, payroll, office space, as well as a common purpose of propping up the GPB/Ascendant Ponzi Scheme—that audit, fund administrative, and other services provided to GPB Capital were effectively provided to Ascendant, and vice-versa.   Consistent therewith, GPB Capital openly referred to Ascendant as an "affiliate" on its website.

139.    The Fund Administrator was a key component in the operation of the GPB Funds.

According to the Automotive PPMs, the Fund Administrator provided "Full Service Investor Administration" and "Investor Relations," included distributions, redemptions, account summary documents, commission calculation, and regulatory compliance. On information and belief, the Fund Administrator provided those same services to the other GPB Funds as well.

140.    In keeping with these duties, the Fund Administrator had access to financial statements and records from the GPB Funds that demonstrated the fee structure of the GPB Funds, as well as payments made to GPB Capital, the underwriters Ascendant and Axiom, and the Broker-Dealers pursuant to that structure.

141.    In addition, the Fund Administrator had access to financial statements and records from the GPB Funds that demonstrated that investment capital was used to pay annual distributions to investors, as opposed to using investment returns.

142.    A state securities regulator found that "the Funds' financials show that distributions were issued that exceeded the funds' net incomes," meaning, that the Funds necessarily "turned to investor contributions to meet the demands of the 8% distributions." **Accordingly, the Fund Administrator had actual knowledge that the GPB Capital model was functioning as a Ponzi scheme.**

143.    Despite its role as a "Full Service Investor Administration" and "Investor Relations," responsible for handling distributions, redemptions, account summary documents, commission calculation, and regulatory compliance, the Fund Administrator never disclosed that the GPB Funds were using investor funds to pay distributions.

144.    Additionally, the Fund Administrator issued misleading account statements to Plaintiffs and other class members listing values that did not deduct or otherwise account for the excessive fees paid in commissions before an investor's funds actually made their way to one of

the GPB Funds—notwithstanding that the Fund Administrator processed many of these fees and thus had actual knowledge that they had been assessed.

145.    Instead, the Fund Administrator prepared and distributed account statements that did not reflect any of these facts, and portrayed to investors that their investment principal was intact and earning annual returns consistent with GPB Capital's representations.

146.    These statements, which the Fund Administrator knew were fraudulent, allowed GPB Capital to conceal the nature of its operations, as well as the nature and amount of the proceeds it and other selected entities were receiving, at the expense of the investors.

147.    The Fund Administrator also had access to GPB Capital's financial statements and other records revealing both the asset values of and number of investors in each Fund.  Many, if not all, of the GPB Funds exceeded the threshold for registration under Section 12(g) of the Exchange Act.  Both GPB Capital Holdings II and GPB Automotive had raised over $650 million from thousands of investors and had more than 2,000 investors each—two pieces of information the Fund Administrator had direct access to.

148.    The Fund Administrator thus knew that the GPB Funds should have been registered with the SEC.  The Fund Administrator ignored this because it was receiving a 7% commission in exchange for its work as a transfer agent for each investment.

149.    The longer the GPB model stayed afloat, the more money the Fund Administrator received.   The Fund Administrator thus continued to "paper over" GBP's fraud.

150.    The Fund Administrator was not the only outside entity that provided assistance in support of the GPB scheme.  The Auditors likewise had access to financials  and other records from the GPB Funds  demonstrating "that distributions were issued that exceeded the funds' net incomes"—meaning, that the Funds necessarily "turned to investor contributions to meet the

demands of the 8% distributions."  Accordingly, the Auditors had actual knowledge that the GPB Capital model was functioning as a Ponzi scheme.

151.    Nonetheless, the Auditors prepared and distributed audited financial statements that did not reflect any of these facts.  These statements falsely portrayed to investors and other concerned parties that the GPB Funds were producing returns consistent with GPB Capital's representations, and that investors stood to receive significant investment returns.

152.    These statements, which the Auditors knew or should of have known were fraudulent, allowed GPB Capital/Ascendant to conceal the nature of their operations, as well as the nature and amount of the proceeds it and other selected entities were receiving, for years at the expense of the investors.

153.    Upon information and belief, audits prepared during the time period 2015 – 2019 overstated GPB Funds' assets by double-digit percentages.  For example, GPB Capital's financials carried the Prime Automotive dealerships at their original purchase price, even though that number did not accurately represent their value during ensuing years.

154.    The Auditors were aware of these and other gross omissions and/or misstatements in the Funds' financials for years 2015 and 2016, to the point that the original "clean audits" for these time periods were eventually withdrawn, and one of the Auditors even resigned.

155.    These same financial statements and records also provided the Auditors with actual knowledge that many, if not all, of the GPB Funds exceeded the threshold for registration under Section 12(g) of the Exchange Act.  The Auditors also knew that GPB Capital and Ascendant continued to sell interests in the GPB Funds without the required registration.

156.    Finally, EisnerAmper, was brought on as auditor of the GPB Funds on November 2, 2018, after the previous auditor (Crowe) resigned.  Upon information and belief, EisnerAmper

reviewed GPB Capital's financials and therefore was aware of the foregoing issues, including the fact that the Funds were issuing distributions despite operating at a loss; the Funds' misstated financials; and the fact that the Funds were due to but had not been registered with the SEC, prior to accepting the engagement.

157.    EisnerAmper was touted by GPB principals as a guarantee of the solidity and legitimacy of the GPB Funds. EisnerAmper knew that its association with the GPB Funds was being communicated directly to investors for the purpose of causing those investors to retain their investment positions with the GPB Funds.

158.    On information and belief, in May 2019, EisnerAmper received a completed questionnaire from David Rosenberg, the then-CEO of one of GPB Automotive's portfolio companies (Prime Automotive), that disclosed the inside and improper nature of the transactions set forth *supra*, including but not limited to that GPB, Gentile, Schneider and others were fabricating revenue and/or engaged in other self-dealing transactions. *See Rosenberg et al. v. GPB Prime Holdings, LLC,* Case No. 19-0925 (Mass. Sup. Ct. [Norfolk Cnty.]), ¶ 72.

159.    Thus, as of at least May 2019, EisnerAmper had concrete knowledge of GPB Capital's improprieties. EisnerAmper did not take appropriate steps to follow up or otherwise act upon this information. Eventually, GPB Capital simply removed Rosenberg from his position in an attempt to silence him.

160.    Investment advisor newsletters and GPB's own investor updates touted GPB's relationship with EisnerAmper:

a.    "We continue to await the completion of the audits through 2018 which EisnerAmper is targeting for 9/30 completion. Once complete, the company will have more flexibility in terms of dividend payments, information dissemination to investors, corporate

borrowings, and deal structuring." Traphagen Financial Group, Q2 2019 Market Synopsis.

        b.    "Audits and Fair Market Values: We remain focused on completing our audited financial statements and filing our Form 10s with the SEC. Additionally, we expect to release Fair Market Values ("FMVs") for each Partnership and, for the first time, for each Limited Partner, in the next two weeks." GPB Letter to Partners, dated October 29, 2019.

        c.    "GPB Management has also shared further details of this event with you, and on October 30, state it does not currently believe the developments related to Mr. Cohn will further delay the delivery of the audited financials beyond the December 31, 2019 deadline." Madison Avenue Securities, Letter to Investor, dated November 15, 2019.

161.    Despite having this knowledge, and despite knowing that its continued association with the GPB Funds was being used by GPB Capital, Ascendant, and the GPB Principals to convince Plaintiff and Class Members to maintain their investments, EisnerAmper continued to serve as auditor of the GPB Funds.

162.    GPB Capital's financial and compliance officers, including Defendants Jacoby, Kgil, Cohn, Frangioni, and Naugle, were integrally involved in the preparation of the financial and other records that revealed the Ponzi scheme, self-dealing and other material misrepresentations described herein.

163.    Per GPB Capital's compliance manual, GPB's compliance financial and/or compliance officers are responsible for "identifying and documenting any compliance issues which may arise." Thus, these individuals had an affirmative duty to seek out violations and therefore knew or should have known that GPB, Ascendant, their affiliates and control persons were engaged in misconduct.

164.    GPB Capital's compliance manual also requires its Chief Compliance Officer

"ensure that all required disclosures are made and that all information presented is accurate and not misleading" and "make such inquiries as necessary to establish the reasonable belief of all advertising claims." Moreover, the compliance manual further specifies that an advertisement is false or misleading if it fails to disclose: that clients "had investment results materially different from the results portrayed in the model/simulation;" any "material conditions, objectives, or investment strategies used to obtain the results portrayed;" or "[s]uggests or makes claims about the potential for profit without also disclosing the probability of loss." Nonetheless, GPB and its financial and compliance Principals failed to disclose that investors' distributions were being funded through contributions, not income from operations.

165.    The GPB compliance manual also provided that all related party transactions were supposed to be subject to review and approval. Cohn, along with GPB Principals Vianna, Bollinger, Frost, Myrianthopoulos, and Shrestha, were in charge of sourcing and managing the Funds' portfolio companies. These individuals knew or should have known that Gentile used the Funds to perpetrate extensive self-dealing as set forth above.

166.    Additionally, GPB Principals Jacoby, Kgil, Cohn were required via the compliance manual to investigate and provide an appropriate valuation for each of GPB Capital's portfolio investments on at least a quarterly basis. These individuals thus knew the Funds' portfolio companies were not generating adequate income to fund the 8% distributions out of operations as promised.

167.    Upon information and belief, GPB Capital's Principals, including Defendants Vianna, Bollinger, Frost, Myrianthopoulos, and Shrestha were in charge of sourcing and managing the Funds' portfolio companies. These individuals knew that Gentile used the Funds to perpetrate extensive self-dealing as set forth above. Additionally, these individuals had access to the earnings

generated by the portfolio companies, and thus knew that the Funds were losing money while still issuing distributions.

168.     The GPB Principals ignored these red flags because they were well-paid for their efforts.

## All Parties to the GPB Funds—Except the Investors—Acted in Concert in Furtherance of the Ponzi Scheme

169.     As set forth above, many hands found their way into the pocket of the GPB Funds, and thus into the pockets of the investors in the GPB Funds.

170.     While the ways in which they profited off the GPB Funds varied from Defendant to Defendant, all of them knew the score—that the GPB Funds were a Ponzi scheme (an unregistered one at that) that charged investors excessive, undisclosed fees for the privilege of using their money to engage in self-dealing transactions.  In short, the GPB Model was designed to enrich everyone involved except the investors.

171.     Armed with this knowledge, each Defendant played their respective part to advance their individual interests at the expense of the investors. Each part was necessary in order for the GPB Funds Ponzi scheme to operate as it did.

## The Named Plaintiffs' Experiences

172.     As of 2017 and continuing thereafter, Plaintiff Millicent R. Barasch purchased and held three units of GPB Automotive Portfolio limited partnership, at a purchase price of $150,000.

173.     As of 2017 and continuing thereafter, Plaintiff Millicent R. Barasch purchased and held four and four-tenths units of GPB Holding II limited partnership, at a purchase price of $220,000.

174.     As of 2017 and continuing thereafter, Plaintiff Millicent R. Barasch purchased and held over five units of GPB Waste Management limited partnership, at a purchase price of

$281,570.40.

175.     Beginning in January 2017 throughout at least the end of 2018, Barasch received account statements from the Fund Administrator regarding her ownership of GPB Holdings II, GPB Automotive, and GPB Waste Management. The statements show a "total capital invested" amount equaling $651,570.40, and distributions totaling $68,074.96 through the end of 2018.

176.     By the end of 2018, Barasch's account statements contained a cryptic disclaimer that had not been previously present.[4]

177.     As of 2018 and continuing thereafter, Plaintiff Loretta DeHay, a resident of Texas, purchased and held 2.0305 units of GPB Automotive, at a purchase price of $100,000.

## FRAUD ALLEGATIONS

178.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

179.     Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendants.

180.     **Who**: Defendants GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners.

181.     **What**: GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners have, through their respective roles in the creation, approval, and dissemination of public documents provided to investors and potential investors, stated, *inter alia*:

   a.     That the GPB Funds were providing an 8% annual dividend to investors, when in fact the GPB Funds were generating little or no returns from the investments made by the

---

[4] *See* Ex B., at 7 ("THIS DISTRIBUTION STATEMENT SHOULD NOT BE CONSIDERED A STATEMENT OF THE PARTNERSHIP'S PERFORMANCE. INVESTMENT INVOLVES SIGNIFICANT RISK AND INVESTORS MAY LOSE SOME OR ALL OF THEIR CONTRIBUTED CAPITAL.")

Funds, and such returns would in fact have been impossible to sustain under the model developed and sold by GPB Capital and Ascendant;

b.  Omitting to disclose the 8% annual dividends that were reported as returns on investments made by the Funds were, in fact, taken from other investors' capital investments and/or from the investor's own capital contributions—in essence, a Ponzi scheme;

c.  That, when stating that GPB Funds *might* make distributions out of capital investments, that in fact the Funds *had* been making such distributions out of capital investments in the past, and was intending to do so going forward;

d.  Via account documents distributed at the direction of the referenced Defendants, that investors had been awarded substantial annual dividends on top of capital investment, when in fact the invested capital of those investors had been reduced in order to fund dividends to other investors;

e.  Omitting to disclose that the underwriters issuing the limited partnerships of the Funds were controlled by the same principals as the Funds themselves, creating a clear conflict of interest; and

f.  Failing to disclose scores of conflicted and/or self-dealing transactions that collectively spent millions of dollars of investor money.

182.  ***When***: Starting no later than 2013, and on an ongoing basis through to the present.

183.  ***Where***: in Private Placement Memoranda, marketing materials, letters, emails and other similar documents distributed to Plaintiffs, Class members, and the public, as well as verbal statements made at so-called "diligence meetings" or other marketing events in Austin, Texas.

184.  ***How***: These Defendants have affirmatively misrepresented, in writing, the nature

of, operation of, and state of investments made into the GPB Funds, as set forth above.

185.     ***Why***: For the purpose of inducing Plaintiffs and other Class members to purchase the limited partnerships in the GPB Funds, rather than pursuing other investment opportunities. Had Defendants disclosed the truth, Plaintiffs and other Class members would not have invested in the GPB Funds.

## TOLLING OF STATUTES OF LIMITATIONS

186.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

187.     All applicable statutes of limitation are and have been tolled by Defendants GPB Capital, Ascendant, Axiom, the GPB Funds, and GPB Principals, and the GPB Owners' misrepresentations and fraudulent concealment of the truth about the nature of the GPB Funds as set forth above.

188.     Plaintiffs and Class members could not, in the exercise of reasonable diligence, have discovered the falsity of Defendants' representations until the revelation of the nature of those relationships via inside sources.

189.     Defendants GPB Capital, Ascendant, Axiom, the GPB Funds, and the GPB Principals, alongside the other Defendants, engaged in an active and affirmative conspiracy to hide the truth of the nature of, operation of, and state of investments made into the GPB Funds.

190.     As such, all statutes of limitation are and have been tolled until the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

191.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

192.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

193.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons who held shares in any of the GPB Funds from November 5, 2015 to the present.

Collectively, all these persons will be referred to as "Class members." Plaintiffs represent, and are members of, the Class. Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and Defendants' agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

194.    Plaintiffs do not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be more than 2,000.

195.    Plaintiffs and members of the Class have been harmed and/or continue to be harmed by the acts of Defendants.

196.    Plaintiffs seek injunctive and declaratory relief on behalf of themselves and all Class members, as well as damages in their individual capacity.

197.    The joinder of all Class members is impracticable due to the number of Class members.

198.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

199.    Further, the Class can be identified easily through records maintained by Defendants GPB Capital, Ascendant and the other underwriters, and/or by the GPB Funds

themselves.

200.     There are well-defined, nearly identical, common questions of law and fact affecting all parties.

201.     The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

202.     Such common questions of law and fact include, but are not limited to, the following:

a.     Whether Defendants had as their object to bring in investment proceeds by and through the GPB Funds, and to appropriate those proceeds for their own gain;

b.     Whether Defendants engaged in activities intentionally directed to the purpose of bringing in investment proceeds by and through the GPB Funds, and to appropriate those proceeds for their own gain;

c.     Whether the materials provided to investors by GPB Capital, Ascendant, Axiom and/or other Defendants on behalf of the GPB Funds, including but not limited to Private Placement Memoranda, marketing materials, letters to investors, and other similar documents, contained material misrepresentations and omissions concerning the source of the GPB Funds' promised annual distributions;

d.     Whether the materials provided to investors by GPB Capital, Ascendant, Axiom and/or other Defendants on behalf of the GPB Funds, including but not limited to Private Placement Memoranda, marketing materials, letters to investors, and other similar documents,

contained material misrepresentations and omissions concerning the undisclosed payment of fees to Ascendant, Axiom, and ultimately, the GPB Owners;

e.  Whether the Auditors, EisnerAmper, CKGF, and the Fund Administrator substantially assisted in the fraud conducted by GPB Capital, Ascendant and the other underwriters, and their Owners, with regard to investors;

f.  Whether GPB Capital, David Gentile, Jeffry Schneider, Michael Cohn, Minchung Kgil, William Jacoby and/or any of the GPB Principals had fiduciary duties to Plaintiffs and Class Members;

g.  Whether GPB Capital, David Gentile, Michael Cohn, Minchung Kgil, and/or William Jacoby breached their fiduciary duties to Plaintiffs and Class Members;

h.  Whether the GPB Principals, Ascendant, Axiom, Jeffry Schneider, Mark Martino, DJ Partners, MR Ranger, CKGF, the Auditors, EisnerAmper, and/or the Fund Administrator substantially assisted in the foregoing breaches of fiduciary duties owed to Plaintiffs and Class Members;

i.  Whether the Auditors, EisnerAmper, and/or the Fund Administrators owed a duty to the Plaintiff and Class Members;

j.  Whether the Auditors, EisnerAmper and the Fund Administrators breached their duties to the Plaintiff and Class Members;

k.  Whether GPB Capital, Ascendant, Axiom, and the GPB Funds violated

Section 581-33(A)(2) of the Texas Securities Act by and through making false material misrepresentations and omissions in connection with the sale of any GPB Fund or the solicitation thereof;

l.    Whether GPB Capital, Ascendant, Axiom,  and/or the GPB Funds violated Section 581-33(A)(1) of the Texas Securities Act by and through selling or soliciting the sale of unregistered securities;

m.    Whether CKGF, the Auditors, EisnerAmper, and/or the Fund Administrator aided and abetted the foregoing violations of the Texas Security Act; and,

n.    Whether the, the GPB Owners, DJ Partners, MR Ranger, CKGF, and/or the GPB Principals were "control persons" with regard to the violations of the Texas Security Act;

203.    The claims of Plaintiffs are typical of the claims of the Class they seek to represent. Plaintiffs and other Class members invested in one or more of GPB Funds during the Class Period.

204.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

205.    Plaintiffs have no interests which are antagonistic to any member of the Class.

206.    Plaintiffs have retained counsel experienced in handling class action claims involving breaches of contract and fiduciary duty, fraud, and securities violations.  Plaintiff's counsel is also experienced in prosecuting the claims of investors against entities that have engaged in malfeasance with respect to investments.

207.    Common issues predominate over any individual issues. The focus of these claims is on the conduct of GPB Capital, Ascendant, Axiom, the GPB Funds, and their associated Owners, Principals and affiliate entities, which did not vary as between class members. Resolution of these

common questions will drive the claims of all Class members toward judgment or resolution: they involve a "fatal similarity" for purposes of the claims of all class members.

208.    A class action is the superior method for the fair and efficient adjudication of this controversy.

209.    Class-wide relief is essential to resolve the claims regarding all potential investors relating to all responsible parties.

210.    Plaintiffs therefore seeks certification of the Class pursuant to Rules 23(b)(1)(A), (b)(2), and (b)(3).

211.    Plaintiffs seek certification of a Rule 23(b)(1)(A) class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants if a class is not certified.

212.    Plaintiffs seek certification of an injunctive and declaratory relief class pursuant to Rule 23(b)(2). Defendants have acted on grounds generally applicable to the Class, and the violations complained of herein are substantially likely to continue in the future if an injunction is not entered. Therefore, final injunctive relief and corresponding declaratory relief with respect to the Class as a whole is appropriate.

213.    Plaintiffs seek certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds or thousands of individual cases involving the same core facts and claims.

214.    In the alternative, Plaintiffs seek certification of an "issues" class pursuant to Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court

adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiffs in ¶ 202, *supra*.

### **CAUSES OF ACTION**

### **COUNT 1:  (AGAINST DEFENDANTS GPB CAPITAL, ASCENDANT, AXIOM, THE GPB FUNDS, THE GPB PRINCIPALS, AND THE GPB OWNERS)**

#### **Fraud**

215.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

216.    GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners knowingly made false representations and omissions regarding the nature of the limited partnership interests offered for sale, including but not limited to (as alleged herein, *supra*) that the GPB Funds would return 8% return on investment proceeds, when in fact those distributions were being made out of the capital contributions of other investors and/or the investor's own capital account; that GPB Capital (and by extension, the GPB Owners) received an undisclosed brokerage fee by way of purported underwriters Ascendant and Axiom; and that the GPB Funds were using investor money to fund various self-dealing transactions.

217.    GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners knew these representations were false at the time they were made.

218.    Moreover, these false statements or omissions were made by GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners for the purpose of inducing Plaintiffs, Class Members, and other potential investors to rely on those representations and invest in the GPB Funds.  All of the Defendants named in this Count stood to benefit from the participation of investors in the GPB/Ascendant Ponzi Scheme

219.    Plaintiffs and Class Members justifiably relied on those representations by GPB

Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners in determining whether to invest and maintain their positions in the GPB Funds.

220.     As a result, Plaintiffs and Class members were injured as a result of the false and misleading statements or omissions, in that their investments in the GPB Funds have lost most or all of their value.

221.     Plaintiffs and the Class, therefore, seek damages in an amount to be determined at trial.

## COUNT 2: (AGAINST DEFENDANTS THE AUDITORS, EISNERAMPER, AND THE FUND ADMINISTRATOR)

### Substantially Assisting in the Commission of Fraud

222.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

*223.*     As set forth in Count One, GPB Capital, Ascendant, Axiom, the GPB Funds, the GPB Principals, and the GPB Owners engaged in fraud by knowingly making false representations and omissions regarding the nature and operations of the GPB Funds.

224.     These knowingly false and misleading statements and omissions were perpetuated by the Auditors' and EisnerAmper's decisions to turn a blind eye to GPB Capital's financial data. They were transmitted to investors via the Fund Administrator.

225.     The Auditors, EisnerAmper, and the Fund Administrator knew that the statements by the GPB entities were false and misleading. More specifically, *inter alia*, they knew that it was not possible for the GPB Funds to pay out a consistent 8% return given the fact that the Funds were operating at a loss; they knew that Ascendant and Axiom were improperly siphoning off fees; and they knew of the extensive and irreconcilable conflicts of interests that were endemic to the operation and management of the GPB Funds.

226.     Absent this collective papering-over of the facts that revealed the true nature of the GPB model, GPB Capital, Ascendant, Axion, the GPB Funds, and the GPB Principals, and the GPB Owners would not have been able to carry out their fraudulent scheme.  As such, the Auditors, EisnerAmper, and the Fund Administrator provided substantial assistance to the GPB entities in their fraudulent conduct.

227.     As a result of this substantial assistance, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial.

## COUNT 3:  (AGAINST ALL DEFENDANTS EXCEPT THE GPB FUNDS)

### Civil Conspiracy

228.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

229.     The GPB Funds were the vehicle through which all other Defendants—GPB Capital, Ascendant, Axiom, the GPB Owners, the GPB Principals, the Auditors, EisnerAmper, the Fund Administrator, and CKGF—perpetuated a complex and multi-faceted scheme to solicit investment income from investors such as Plaintiffs and the class members, and then extract the proceeds of those investments for their own gain.

230.     While each of the players or groups of players had their own part in the overall scheme, and their own particularized income streams derived from their part, taken as a whole this amounts to a coordinated effort by all Defendants (by and through the Funds) to defraud Plaintiffs and class members.

231.     Under Texas law, a civil conspiracy requires "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar Corp., Inc. v. Electro Circuits*

*Int'l, LLC,* 580 S.W.3d 136, 141 (Tex. 2019).

232.    As set forth in this complaint, dozens of individuals and entities, named as Defendants in this matter, are involved in some element of the overall scheme.

233.    The object to be accomplished in this case was clear—to bring in investment proceeds under false and misleading circumstances, and to then appropriate those assets for their own benefit at the expense of those investors.

234.    All Defendants had a meeting of the minds in this matter. They either engaged in operations that were explicitly and intentionally designed to defraud investors, or had full information necessary to know that the purpose of the GPB Funds was to defraud investors and chose nevertheless to participate.

235.    Defendants, individually and collectively, engaged in numerous unlawful, overt acts as set forth in Plaintiffs' subsequent causes of action.

236.    Finally, Plaintiffs and class members have lost, collectively over $1.8 billion, representing the money invested in the GPB Funds that is currently in the hands of Defendants, or remaining in the funds themselves.

## COUNT 4: (AGAINST DEFENDANTS GPB CAPITAL AND THE GPB PRINCIPALS)

### Breach of Fiduciary Duty

237.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

238.    GPB Capital is, and for all relevant times was, the general partner of the GPB Funds, and was a registered investment advisor. The GPB Principals, and Schneider as a strategic advisor, were individually and collectively responsible for carrying out GPB Capital's duties.

239.    As such, GPB Capital, Schneider, and the GPB Principals owed fiduciary duties to

the investors who bought limited partnerships in the GPB Funds. These duties may not be waived or contracted around.

240.     GPB Capital, Schneider, and the GPB Principals breached their fiduciary duties in several respects, including *inter alia*, (1) the GPB Funds were operated intentionally as a Ponzi scheme, extracting proceeds from investors for their own gains; (2) GPB Capital had massive and wholly undisclosed conflicts of interests, in the form of the co- ownership relationship between GPB Capital, Ascendant, Axiom, and the GPB Funds; and (3) the GPB Funds engaged in self-dealing transactions that directly benefitted Gentile, Schneider, and other insiders at the expense of the Funds and the investors.

241.     GPB Capital also failed to complete required audits in a timely fashion—even after the SEC ordered GPB Capital to file audited financials—causing its portfolio companies (including Prime Automotive) to violate their loan covenants.   This ultimately required the companies to enter into expensive forbearance agreements, the cost of which was ultimately borne by investors.

242.     Because of these breaches of fiduciary duty, Plaintiffs and Class members have sustained the loss of their investment capital.

243.     As such, Plaintiffs and Class members were damaged, and are entitled to damages in an amount to be proven at trial.

## COUNT 5: (AGAINST DEFENDANTS THE GPB OWNERS, ASCENDANT, AXIOM, CKGF, THE AUDITORS, EISNERAMPER, AND THE FUND ADMINISTRATOR)

### Substantially Assisting in the Breach of Fiduciary Duty

244.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

245.     As set forth in Count Four, GPB Capital and the GPB Principals breached their

fiduciary duties to Plaintiffs and Class Members.

246.     The GPB Owners, who shared co-ownership of GPB Capital, knew of the conduct by GPB Capital (and, indeed were actively involved in the breaches), profited directly from those breaches, and did nothing to alert relevant parties as to those breaches.

247.     Similarly, Ascendant, Axiom, and CKGF, which shared many of the same interrelationships and were directly involved in the self-dealing fiduciary duty breaches, knew of the conduct of GPB Capital and its Principals, profited directly from the breaches, and did nothing to alert relevant parties as to those breaches.

248.     Likewise, the Auditors and the Fund Administrator knew of the conduct by GPB Capital, and its Principals, knew of the duties those parties owed to Plaintiffs and Class Members, and took active steps to cover up the breaches. Specifically, the Auditors and the Fund Administrators failed to alert relevant parties as to those breaches, and distributed documents that contained false statements designed to hide the breaches of fiduciary duty by GPB Capital and its Principals.

249.     Finally, EisnerAmper knew of the conduct by GPB Capital, Gentile, and Jacoby, knew of the duties those parties owed to Plaintiff and Class Members, and took active steps to cover up the breaches. Specifically, EisnerAmper failed to alert relevant parties as to those breaches, and knowingly allowed their continued status as auditor of the GPB Funds to be utilized in public statements by GPB Capital and the GPB Principals to dissuade Plaintiffs and Class Members from investigating GPB Capital's activities.

250.     As a direct and proximate cause of the substantial assistance provided by these parties, Plaintiffs and other Class Members were damaged, and are entitled to damages in an amount to be proven at trial.

## COUNT 6: (AGAINST DEFENDANTS THE AUDITORS AND THE FUND ADMINISTRATOR)

### Negligence

251.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

252.     The Auditors had a duty to Plaintiffs and Class Members to exercise reasonable care in conducting and facilitating the audits, the results of which they knew would be provided to Plaintiffs and Class Members.

253.     The Auditors breached that duty by providing material incorrect audit documents, in violation of applicable accounting standards and in a negligent manner.

254.     The Fund Administrator had a duty to Plaintiffs and Class Members to exercise reasonable care in the preparation of account statements that were distributed to Plaintiffs and Class Members.

255.     The Fund Administrator breached that duty by providing material incorrect account statements, in violation of applicable standards in the financial services industry and in a negligent manner.

256.     Defendants' negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses, in the form of investment losses that would not have occurred if Defendants had shown due care toward by following applicable rules and standards.

257.     These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial.

## COUNT 7: (AGAINST DEFENDANTS GPB CAPITAL, ASCENDANT, AXIOM, AND THE GPB FUNDS)

### Violations of Section 581-33(A)(2) of the Texas Security Act

258.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

259.     Texas Revised Civil Statutes, art. 581-33(A)(2) provides that "[a] person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security."

260.     Section (A)(4) makes clear that a "security" includes limited partnership interests of the type offered by the GPB Funds.

261.     As set forth above, GPB Capital, Ascendant, Axiom, and the GPB Funds made numerous false or deliberately misleading statements about the nature of the GPB Funds, including, *inter alia*, (1) the GPB Funds were operated intentionally as a Ponzi scheme, extracting proceeds from investors for their own gains; (2) GPB Capital had massive and wholly undisclosed conflicts of interests, in the form of the co-ownership relationship between GPB Capital, the GPB Funds, and Ascendant and Axiom; and (3) the GPB Funds engaged in self-dealing transactions that directly benefitted Gentile, Schneider, and other insiders at the expense of the Funds and the investors.

262.     As such, Plaintiffs and the Class Members are entitled to rescission or damages in an amount to be proven at trial.

## COUNT 8: (AGAINST DEFENDANTS THE AUDITORS, EISNERAMPER, CKGF, AND THE FUND ADMINISTRATOR)

**Aiding and Abetting Violations of Section 581-33(A)(2) of the Texas Security Act**

263.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

264.    Texas Revised Civil Statutes, art. 581-33(F)(2) provides that "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer."

265.    As set forth in Count Seven, GPB Capital, Ascendant, Axiom, and the GPB Funds violated Texas Revised Civil Statutes, art. 581-33(A)(2), by making numerous and consistent false statements regarding the nature and operation of the GPB Funds.

266.    The Auditors, EisnerAmper, and the Fund Administrator knew of the conduct by GPB Capital, Ascendant, Axiom and the GPB Funds, yet distributed documents that perpetuated the false statements of GPB Capital, Ascendant, Axiom, and the GPB Funds; allowed their name to be used to promote the GPB/Ascendant Ponzi Scheme; and failed to alert relevant parties as to those breaches.

267.    Defendant CKGF knew of the conduct of GPB Capital and the GPB Funds, was involved in the improper and self-dealing transactions that were not disclosed to Plaintiffs and Class Members, and did nothing to alert relevant parties as to those breaches.

268.    As such, the Auditors, EisnerAmper, and the Fund Administrator are jointly and severally liable for the violations set forth in Count Seven.

**COUNT 9: (AGAINST DEFENDANTS THE GPB PRINCIPALS, THE GPB OWNERS, AND CKGF)**

**Control Person Violations of Section 581-33(A)(2) of the Texas Security Act**

269.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

270.     Texas Revised Civil Statute art. 581-33(F)(2) provides that "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist."

271.     As set forth in Count Seven, GPB Capital, Ascendant, Axiom, and the GPB Funds violated Texas Revised Civil Statutes, art. 581-33(A)(2), by making numerous and consistent false statements regarding the nature and operation of the GPB Funds.

272.     The GPB Principals were the day-to-day operators of GPB Capital, and were responsible for carrying out its operations.

273.     The GPB Owners directly control GPB Capital and the GPB Funds through a co-ownership relationship between GPB Capital, Ascendant, and Axiom.

274.     Ascendant and Axiom indirectly control GPB Capital and the GPB Funds via the same co-ownership arrangement via the GPB Principals.

275.     Finally, CKGF indirectly controls GPB Capital and the GPB Funds, as the principals of CKGF and GPB Capital overlap, as David Gentile is a key member of both entities.

276.     As such, the GPB Principals, the GPB Owners, and CKGF are jointly and severally liable for the violations set forth in Count Seven.

### COUNT 10: (AGAINST DEFENDANTS GPB CAPITAL, ASCENDANT, AXIOM, AND THE GPB FUNDS)

### Violations of Section 581-33(A)(1) the Texas Security Act

277.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

278.     Texas Revised Civil Statutes, art. 581-33(A)(1) provides that [a] person who offers or sells a security in violation of Section 7 . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."

279.     Texas Revised Civil Statutes, art. 581-7(A) states that "[n]o dealer or agent shall sell or offer for sale any securities . . . except those which have been registered . . . and except those which come within the classes enumerated in Section 5 or Section 6 of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner."

280.     The limited partnerships offered by the GPB Funds and sold and/or solicited by GPB Capital, Ascendant, and Axiom were not registered pursuant Section 7(A) of the Texas Securities Act.

281.     The limited partnerships offered by the GPB Funds and sold and/or solicited by GPB Capital, Ascendant and Axiom were not exempt under Section 5 of the Texas Securities Act.

282.     The limited partnerships offered by the GPB Funds and sold and/or solicited by GPB Capital, Ascendant and Axiom were not exempt under Section 6 of the Texas Securities Act, as they, *inter alia*, are not listed on an approved national stock exchange. *See* Texas Revised Civil Statutes, art. 581-6(F).

283.     The limited partnerships offered by the GPB Funds and sold and/or solicited by

GPB Capital, Ascendant and Axiom were not exempt under Rule 506 of Regulation D, either, due to the undisclosed involvement of bad actors Schneider and Martino.

284.     GPB Capital and the GPB Funds sold these unregistered securities to Plaintiffs and Class Members, including investors in the State of Texas, in violation of Section 7(A).

285.     As such, Plaintiffs and the Class Members are entitled to rescission or damages in an amount to be proven at trial.

## COUNT 11: (AGAINST DEFENDANTS THE AUDITORS, EISNERAMPER, AND THE FUND ADMINISTRATOR)

### Aiding and Abetting Violations of Section 581-33(A)(1) the Texas Security Act

286.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

287.     Texas Revised Civil Statutes, art. 581-33(F)(2) provides that "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer."

288.     As set forth in Count Ten, GPB Capital, Ascendant, Axiom and the GPB Funds violated Texas Revised Civil Statutes, art. 581-7(A), by selling to Plaintiffs and Class Members unregistered securities, in the form of the limited partnerships in the GPB Funds.

289.     Defendants the Auditors and the Fund Administrator knew that GPB Capital and the GPB Funds were selling limited partnerships to Plaintiffs and Class Members, knew or should have known that these securities were unregistered, and knew or should have known that they were required to be registered under Section 7(A) of the Texas Securities Act.

290.     As such, the Auditors, EisnerAmper, and the Fund Administrator are jointly and

severally liable for the violations set forth in Count Ten.

## COUNT 12: (AGAINST DEFENDANTS THE GPB PRINCIPALS, THE GPB OWNERS, AND CKGF)

### Control Person Violations of the Section 581-33(A)(1) Texas Security Act

291.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

292.    Texas Revised Civil Statutes, art. 581-33(F)(2) provides that "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist."

293.    As set forth in Count Ten, GPB Capital, Ascendant, Axiom, and the GPB Funds violated Texas Revised Civil Statutes, art. 581-7(A), by selling to Plaintiff and Class Members unregistered securities, in the form of the limited partnerships in the GPB Funds.

294.    The GPB Principals were the day-to-day operators of GPB Capital, and were responsible for carrying out its operations.

295.    The GPB Owners directly control GPB Capital and the GPB Funds through a co-ownership relationship between GPB Capital and the Underwriters.

296.    Finally, CKGF indirectly controls GPB Capital and the GPB Funds, as the principals of CKGF and GPB Capital overlap, as David Gentile is a key member of both entities.

297.    As such, the GPB Principals, GPB Owners, and CKGF are jointly and severally liable for the violations set forth in Count Ten.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs and all Class members the following relief against the Defendants:

        A.      For all recoverable compensatory and other damages sustained by Plaintiffs and the Class;

        B.      For the rescission of all investments made by Plaintiffs and Class Members to the GPB Funds, as well as all transactions made by the GPB Funds to other entities in furtherance of the civil conspiracy;

        C.      An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

        D.      An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

        E.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

Dated: June 30, 2020

                           */s/Joseph Peiffer*_____
                           PEIFFER WOLF CARR AND KANE, APLC
                           Joseph Peiffer (*pro hac vice*)
                           Email: jpeiffer@pwcklegal.com
                           Kevin P. Conway (*pro hac vice*)
                           Email: kconway@pwcklegal.com
                           Jason J. Kane (*pro hac vice*)
                           Email: jkane@pwcklegal.com
                           Daniel B. Centner *(pro hac vice to be filed)*
                           Email: dcentner@pwcklegal.com
                           1519 Robert C. Blakes Sr. Drive
                           New Orleans, LA 70130
                           Telephone: (504) 523-2434
                           Facsimile: (504) 523-2464

MEYER WILSON CO., LPA
David Meyer (*pro hac vice*)
Email: dmeyer@meyerwilson.com
Matthew R. Wilson (*pro hac vice*)
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (*pro hac vice*)
Email: mboyle@meyerwilson.com
Courtney M. Werning (*pro hac vice*)
Email: cwerning@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066


STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.
Timothy S. DeJong (*pro hac vice to be filed*)
Email: tdejong@stollberne.com
Megan K. Houlihan (*pro hac vice to be filed*)
Email: mhoulihan@stollberne.com
209 SW Oak Street, Ste. 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby Certify that, on this 30th day of June 2020, I electronically filed the above Second Amended Complaint with the Clerk of Court using the CM/EMF system.

*/s/Joseph Peiffer*